# United States Court of Appeals
## For the First Circuit

No. 22-1913

RHODE ISLAND TRUCK CENTER, LLC,

Plaintiff, Appellant,

v.

DAIMLER TRUCKS NORTH AMERICA, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

Edward J. Sackman, with whom Hilary Holmes Rheaume, Bernstein, Shur, Sawyer & Nelson, P.A., Samira Omerovic, and Omerovic Legal, PLLC were on brief, for appellant.
Nathan D. Imfeld, with whom Roberta F. Howell and Foley & Lardner LLP were on brief, for appellee.

July 6, 2026

BARRON, **Chief Judge**.  Like many states, Rhode Island limits a motor vehicle manufacturer's ability to establish a new dealership near one of its existing in-state dealerships even if its franchise agreement with that existing dealership does not impose such a limitation.  See R.I. Gen. Laws § 31-5.1-4.2(a)-(b). We are not aware of any state other than Rhode Island, however, that extends this limitation to new dealerships outside the state. In this appeal, we must decide whether Rhode Island's enforcement of this unusual aspect of its dealer protection law would violate the "dormant" component of the Commerce Clause of the U.S. Constitution -- or, as it is often called, the "Dormant Commerce Clause."  We conclude that it would and so affirm the judgment below.

## I.

## A.

The Rhode Island law in question, which we shall refer to as the "Dealer Law,"[1] requires, among other things, that a motor vehicle manufacturer "notify" each one of its franchisees that qualifies as a "new motor vehicle dealer" that the manufacturer intends to establish in that dealer's "relevant market area" an additional "new motor vehicle dealer" for the same "line or make"

---

[1] The Dealer Law is located at R.I. Gen. Laws §§ 31-5.1-1 to 31-5.1-21.

of vehicle.[2]   Id. § 31-5.1-4.2(a).   The Dealer Law defines "relevant market area" as the greater of: (1) "the area within a radius of twenty (20) miles around an existing dealer" or (2) "the area of responsibility defined in the franchise."   Id. § 31-5.1-1(13) (emphasis added).   It defines "dealer" to include only entities with "an established place of business . . . in [Rhode Island]," id. § 31-1-19(b), while its definition of "new motor vehicle dealer" is not so limited, see id. § 31-5.1-1(11).[3]

In February 2022, Rhode Island Truck Center, LLC ("RITC") filed a protest pursuant to the Dealer Law with the Rhode Island Dealers' Hearing Board (the "Board")[4] against Daimler Trucks North America, LLC ("Daimler").   RITC alleged that Daimler had violated the Dealer Law's notification requirement.

The filings in the protest allege the following facts, which the parties agree we may accept as true for purposes of this

_____

[2] Specifically, the statute states that a "manufacturer shall in writing by certified mail first notify the department and each new motor vehicle dealer in the same line or make in the relevant market area of the intention to establish an additional dealership[,] to add an additional location for an existing new motor vehicle dealership, or to relocate an existing dealership within or into that market area."  Id. § 31-5.1-4.2(a).

[3] "New motor vehicle dealer" is defined to include "any person" that has a franchise with the manufacturer "for the retail sale of [its] new motor vehicles."  Id. § 31-5.1-1(11).

[4] The Board has been assigned by regulation to adjudicate protest actions under the Dealer Law on behalf of Rhode Island's Department of Revenue.  See id. §§ 31-5.1-4.2(a), 31-5-1(a); 280 R.I.C.R. 30-20-1.3 (LexisNexis 2026).

appeal. RITC is a new motor vehicle dealer with its principal place of business in East Providence, Rhode Island, near the border with Massachusetts. Daimler is a motor vehicle manufacturer incorporated in Delaware with a principal place of business in Oregon.

Daimler manufactures the Freightliner brand of trucks. In 2016, it granted RITC a franchise to sell Freightliner trucks in a non-exclusive "Area of Responsibility" ("AOR") that includes various Rhode Island counties and Bristol County, Massachusetts. Around 2021, Daimler similarly granted a Freightliner franchise to another dealer, Advantage Truck Raynham, LLC ("ATG Raynham"), in Bristol County, Massachusetts. Daimler, however, "never notified RITC in writing, or otherwise, that it intended to establish a Freightliner dealership within RITC's AOR."[5]

In its protest based on Daimler's alleged violation of the notification requirement, RITC sought: (1) "[a] finding and ruling that [Daimler] violated [the notification requirement] by adding a Freightliner franchisee to RITC's relevant market area without providing the requisite statutory notice and allowing RITC

_____

[5] RITC further alleged that Daimler "d[id] not have good cause to establish" such a dealership because "RITC meets or exceeds [Daimler's] standards for customer care[ and] sales" and because "the market of Bristol County, Massachusetts[,] does not and cannot support two . . . Freightliner dealerships." See R.I. Gen. Laws §31-5.1-4.2(b)(1)-(12) (listing factors for determining whether "good cause" exists for a manufacturer to establish or relocate a dealership within an existing dealer's AOR).

- 4 -

to protest"; (2) a "finding and ruling that [Daimler's] violation of [the notification provision] must be remedied by [Daimler] removing the new and unauthorized Freightliner franchise within RITC's relevant market area"; and (3) civil damages, costs, and attorneys' fees.

With the parties' assent, the Board addressed RITC's protest on the pleadings. The Board did not question its authority to redress a protest that alleges a violation of the notification requirement by ordering a manufacturer that has already established a new dealership to terminate its franchise agreement with that new dealership. It explained, however, that it lacked jurisdiction over RITC's protest nonetheless.

That conclusion rested on two grounds. First, the Board concluded that, under our decision in Fireside Nissan, Inc. v. Fanning, 30 F.3d 206 (1st Cir. 1994), and a decision based on that ruling by the U.S. District Court for the District of Rhode Island,[6] Rhode Island's Dealer Law does not apply to out-of-state conduct as a matter of state law. It thus concluded that it "lacks the authority to apply" the Dealer Law "in an extraterritorial manner and therefore cannot prohibit [Daimler] from establishing or moving a dealership outside the boundaries of th[e] state."

---

[6] That case was County Motors, Inc. v. General Motors Corp., No. CIV.A. 00-108T, 2001 WL 34136693 (D.R.I. Jan. 29, 2001).

Second, the Board determined that such enforcement of the Dealer Law would violate the Dormant Commerce Clause. Specifically, the Board reasoned:

> The Commerce Clause of the United States Constitution precludes the application of a state statute to commerce that takes place wholly outside the State's borders, whether or not the commerce has effects within the State. Edgar v. MITE Corp., 457 U.S. 624, 642-643 (1982). A state statute that "may adversely affect interstate commerce by subjecting activities to inconsistent regulations" may be considered invalid under the Commerce Clause. Morley-Murphy Co. [v.] Zenith Elecs. Corp., 142 F.3d 373, 379 (7th Cir. 1998) (citing CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 88 (1987)). Any attempt to apply Rhode Island's dealership, distribution and franchise law in an extraterritorial manner would certainly run afoul of the Commerce Clause.

Based on these reasons, the Board dismissed RITC's protest for want of jurisdiction.

**B.**

RITC sought review of the Board's decision in a complaint that it filed in the Rhode Island Superior Court pursuant to R.I. Gen. Laws §§ 31-5.1-16 and 42-35-15(b). Those provisions set forth the procedures under Rhode Island law for seeking judicial review of a final order of the Board.

Daimler removed RITC's action to the U.S. District Court for the District of Rhode Island based on diversity jurisdiction. Daimler thereafter filed a motion to dismiss RITC's complaint.

- 6 -

With the parties' assent, the District Court elected to treat the parties' filings as cross motions for summary judgment. It then granted Daimler's motion for summary judgment, denied RITC's motion for the same, and entered judgment in Daimler's favor.

The District Court first rejected RITC's argument that the Board could adjudicate RITC's protest without applying Rhode Island's Dealer Law extraterritorially, concluding that applying the statute to Daimler's conduct "would have the effect of extraterritorially regulating conduct in Massachusetts." (Citing Healy v. Beer Inst., Inc., 491 U.S. 324, 336 (1989).) In reaching that conclusion, the District Court first reasoned that, under Fireside Nissan, the Dealer Law's provisions do not apply beyond Rhode Island's borders as a matter of state law. But even if they did, the District Court explained that "the statute would still be subject to the limits imposed by the Commerce Clause." In that regard, the District Court distinguished the Dealer Law from the statute that we upheld against a Dormant Commerce Clause challenge in IMS Health Inc. v. Mills, 616 F.3d 7 (1st Cir. 2010), vacated on other grounds sub nom., IMS Health, Inc. v. Schneider, 564 U.S. 1051 (2011). It reasoned that here, "unlike in [IMS Health], the harm did not occur exclusively within the state of Rhode Island" since "there would be no claim in Rhode Island were it not for the underlying conduct that took place in Massachusetts."

- 7 -

"Accordingly," the District Court concluded, "there was enough out-of-state activity in this case to merit scrutiny of Rhode Island's ability to regulate these parties' interactions."

The District Court then concluded that, insofar as the Board would be required in adjudicating RITC's protest to "regulat[e] . . . out-of-state firms," it lacked authority to do so. It explained that, under the Dormant Commerce Clause, "no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another" (quoting Healy, 491 U.S. at 337), and the Dealer Law in effect did just that by requiring Daimler "to answer to the [Rhode Island] Board . . . for its decisions to grant or not grant a franchise in Massachusetts."[7]

## C.

RITC timely appealed. In our prior opinion addressing the appeal, we concluded that we had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1441(a) over RITC's action challenging the Board's jurisdictional ruling. R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC ("RITC I"), 92 F.4th 330, 345 (1st Cir. 2024). That action, we explained, raised a federal question because RITC

---

[7] RITC also argued that the Board should have adjudicated its "remaining claims" -- that is, those that did not require extraterritorial application of the Dealer Law. The District Court rejected that argument, reasoning that all of the rights RITC asserted in its protest "r[a]n afoul of the Commerce Clause."

could not successfully challenge the Board's jurisdictional ruling without showing that the Dormant Commerce Clause permitted the Dealer Law to be enforced to redress Daimler's establishment of the Massachusetts dealership. Id. at 342. In addition, based on our supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a), we affirmed the District Court's grant of summary judgment to Daimler on another of RITC's claims under the Dealer Law. Id. at 345-46, 354.

We held in abeyance, however, RITC's appeal of the District Court's grant of summary judgment to Daimler on RITC's challenge to the Board's Dormant Commerce Clause-based ruling concerning the Dealer Law's notification provision. Id. at 353. We did so because we certified to the Rhode Island Supreme Court an "issue of state statutory construction" concerning the scope of the Dealer Law that was "antecedent to the questions concerning the Dormant Commerce Clause on which the parties chiefly focus." Id. at 346-47.

If the term "relevant market area" in the Dealer Law does not "encompass an area beyond Rhode Island's borders," we explained, then the Dealer Law would provide RITC with no basis to challenge Daimler's failure to notify it of Daimler's intent to grant a Freightliner franchise to ATG Raynham in Massachusetts. Id. at 347. And "in that case," we explained, there "would be no need for us to reach the question of whether the Dormant Commerce

Clause would bar" RITC from seeking relief on that basis. Id.
Accordingly, we certified the following question to the Rhode
Island Supreme Court:

> 1. Can a "relevant market area" in Rhode
> Island General Laws section 31-5.1-4.2(a)
> extend beyond Rhode Island's borders?

Id. at 353.[8]

The Rhode Island Supreme Court has now answered that
question as follows: "[T]he definition of 'relevant market area'
contained in § 31-5.1-1(13), and as used in § 31-5.1-4.2(a), can
extend beyond Rhode Island's borders." R.I. Truck Ctr., LLC v.
Daimler Trucks N. Am., LLC ("RITC II"), 338 A.3d 1056, 1064 (R.I.
2025). And, in doing so, the Rhode Island Supreme Court has
explained that the Dealer Law is unambiguous in defining "relevant
market area" to extend beyond the state's borders, thereby
foreclosing any narrower, in-state-only construction based on
principles of constitutional avoidance. See id. at 1063. As a
result, we must now address the Dormant Commerce Clause issue that
we have held in abeyance.

---

[8] We also rejected Daimler's contention that we should defer
to the Board's interpretation of the scope of the Dealer Law, as
we were not confident that "the Rhode Island Supreme Court would
agree that this specific construction by the Board would be
entitled to deference." RITC I, 92 F.4th at 352 n.11.

"We review the District Court's grant of summary judgment to Daimler de novo." RITC I, 92 F.4th at 346 (citation modified). "A party is entitled to summary judgment only when the record reveals no genuine issue as to any material fact and it is clear that judgment is proper as a matter of law." Phila. Indem. Ins. v. BAS Holding Corp., 78 F.4th 53, 58 (1st Cir. 2023). In conducting our review, "[w]e are not wedded to the [D]istrict [C]ourt's rationale but, rather, may affirm . . . on any ground supported by the record." Burt v. Bd. of Trs. of Univ. of R.I., 84 F.4th 42, 54 (1st Cir. 2023).

As a threshold matter, Daimler argues that we must defer to the Board's assessment of whether its enforcement of the Dealer Law would run afoul of the U.S. Constitution, regardless of how we might rule on the Dormant Commerce Clause issue on our own. But we know of no Rhode Island law or precedent that requires a reviewing court to defer to a Rhode Island state agency's determination that it lacks jurisdiction to enforce an otherwise clearly applicable state statute on the ground that it violates the U.S. Constitution. Nor does Daimler identify any such authority. We therefore proceed to consider de novo whether the Board's enforcement of the Dealer Law would violate the Dormant Commerce Clause, given the parties' agreement that the Board lacks jurisdiction to undertake enforcement that would do so. As we

will explain, we conclude, based on our controlling precedent, that enforcement of the Dealer Law here would result in such a violation.

## A.

The U.S. Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "Although the [Commerce] Clause is framed as a positive grant of power to Congress," the Supreme Court of the United States "ha[s] consistently held this language to contain a further, negative command, known as the [D]ormant Commerce Clause, prohibiting certain state [regulations] even when Congress has failed to legislate on the subject." Comptroller of Treasury of Md. v. Wynne, 575 U.S. 542, 548-49 (2015) (quoting Okla. Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 179, (1995)); see Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 588 U.S. 504, 514 (2019).

The Supreme Court's "[m]odern" Dormant Commerce Clause precedents "rest upon two primary principles." South Dakota v. Wayfair, Inc., 585 U.S. 162, 173 (2018). "First, state regulations may not discriminate against interstate commerce," id., either "in purpose or effect," Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 10 (1st Cir. 2007). If a state law discriminates against interstate commerce, it is subjected to "a virtually per se rule of invalidity." Wayfair, 585 U.S. at 173 (quoting Granholm

- 12 -

v. Heald, 544 U.S. 460, 476 (2005)).  "Under this rigorous form of review, a statute [will be held] invalid unless it furthers a legitimate local objective that cannot be served by reasonable non-discriminatory means."  Wine & Spirits Retailers, 481 F.3d at 10-11.  Second, even a facially neutral state law may be struck down if the "burden" it imposes on interstate commerce "is clearly excessive in relation to [its] putative local benefits."  Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

Here, however, in rejecting RITC's challenge to the Board's jurisdictional ruling, the District Court -- like the Board itself -- appeared to rely on an arguably distinct principle, which we have referred to in IMS Health as being rooted in "the extraterritoriality branch of the [D]ormant Commerce Clause."  616 F.3d at 25.  Daimler asks us to affirm the District Court's ruling on that basis. We thus start and, for reasons that we will explain, end our analysis by considering that request.

**B.**

In its most recent decision about the Dormant Commerce Clause, which was issued during the pendency of this appeal, the Supreme Court of the United States expressly addressed this "extraterritoriality" branch of Dormant Commerce Clause doctrine. The Court did so in rejecting the Dormant Commerce Clause challenge in National Pork Producers Council v. Ross ("Pork Producers"), 598 U.S. 356, 371 (2023), which concerned a California law that

required all pork sold in that state to be sourced from pigs that were not "confined in a cruel manner" or born to breeding pigs so confined, id. at 365-66.

Following oral arguments in our Court in this case, we allowed the parties to provide supplemental briefing to address Pork Producers's discussion of the extraterritoriality issue. Having reviewed that briefing, we agree with RITC that Pork Producers calls into question some of the reasoning in the District Court's decision rejecting the challenge to the Board's jurisdictional determination.

Specifically, the Supreme Court made clear in Pork Producers that its precedents in Healy v. Beer Institute, Inc., 491 U.S. 324 (1989), Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573 (1986), and Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511 (1935), do not support a rule that state laws that affect out-of-state conduct are per se invalid under the Dormant Commerce Clause. Pork Producers, 598 U.S. at 371. The Court explained that those cases instead involved the Dormant Commerce Clause's "familiar concern with preventing purposeful discrimination against out-of-state economic interests." Id.

Thus, the District Court's reliance on Healy, Brown-Forman, and Baldwin in finding a Dormant Commerce Clause violation here is problematic. After all, the District Court did not find that the Dealer Law manifested the kind of discriminatory

- 14 -

purpose that, after Pork Producers, we must understand those cases to have identified.

In addition, Pork Producers rejected any notion that its prior precedents could support the conclusion that the Dormant Commerce Clause per se forbids "enforcement of state laws that have the practical effect of controlling commerce outside the State."  598 U.S. at 371 (emphasis added) (internal quotations omitted); see also id. at 374 ("[M]any (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior.").  Thus, to the extent that the District Court could be understood to have relied on such a principle -- such as when it emphasized that enforcing the Dealer Law here "would have the effect of extraterritorially regulating conduct in Massachusetts" -- we cannot agree that there is any such broad-form principle.

We do not understand the District Court, however, to have rested its Dormant Commerce Clause ruling merely on the "practical effects" that enforcement of the Dealer Law would have on an out-of-state transaction.  We understand the District Court to have concluded that enforcement of the Dealer Law here would directly regulate an out-of-state transaction -- namely, Daimler's transaction with its new Massachusetts franchise operating within RITC's relevant market area -- by requiring Daimler "to seek regulatory approval" in Rhode Island regarding its decision to

establish such a franchise in Massachusetts.  (Quoting Healy, 491 U.S. at 337.)

Notably, RITC does not dispute that the Dealer Law, unlike the measure in Pork Producers itself, does "directly regulate[] out-of-state transactions," 598 U.S. at 376 n.1, when enforced as RITC seeks to have it enforced here with respect to Daimler's termination of its franchise agreement with ATG Raynham.[9] And we can see why, given the Court's decision in Edgar v. MITE Corp., 457 U.S. 624, and Pork Producers's discussion of that precedent, see 598 U.S. at 376 n.1.

The state law in Edgar was an Illinois corporate takeover statute that required registration of certain tender offers, even if those offers were made between entities outside the state.  See 457 U.S. at 626-27.  In concluding that the statute "directly regulate[d]" out-of-state transactions, the plurality in that case explained that the Illinois law purported to bar an offeror from

---

[9] In its supplemental brief, RITC does suggest that its request for damages due to Daimler's alleged violation of the notification provision would only amount to an indirect regulation of Daimler's conduct.  However, the Board appeared to presume that its jurisdiction over RITC's protest action as a whole turned on whether the Board had authority to enjoin Daimler to act (or not act) outside Rhode Island.  On appeal, RITC does not argue that that presumption was in error.  Nor does it develop an argument that we should partially vacate and remand with respect to some of the forms of relief it sought, even if we disagree with the District Court's Dormant Commerce Clause ruling as to others.  Thus, any argument to that effect is deemed waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

executing even out-of-state transactions unless the offeror had first complied with the statute's terms. See id. at 641-42 (plurality opinion). By contrast, the plurality explained, the "blue-sky" laws that the Court had previously upheld against Dormant Commerce Clause challenges required filing information regarding securities issued outside the state only when there was a disposition of such securities "within the State," and in that sense, those laws "only regulated transactions occurring within the regulating States." Id. at 641 (quoting Hall v. Geiger-Jones Co., 242 U.S. 539, 557-58 (1917)).

Like the Illinois takeover statute in Edgar, the requested enforcement of the Dealer Law would, "unless complied with," seek to "prevent" a franchisor-manufacturer with an in-state dealer-franchisee from "concluding interstate transactions not only" within that state, "but also with those living in other States and having no connection with [that state]." Id. at 642. To be sure, the Dealer Law's notification provision applies only once a manufacturer has entered into a franchise agreement with a Rhode Island dealer. See R.I. Gen. Laws §§ 31-5.1-4.2(a), 31-5.1-1(13). That provision, though, is not, like the blue-sky laws discussed in Edgar, triggered only in response to in-state transactions. Cf. 457 U.S. at 641.

Of course, Pork Producers does not hold that a state law that directly regulates an out-of-state transaction is, for that

reason alone, invalid under the Dormant Commerce Clause. The Court explained there that, although the plurality in Edgar concluded that the law at issue there was per se invalid on Dormant Commerce Clause grounds, that law not only "directly regulated out-of-state transactions" but also did so as to "transactions by those with no connection to" the regulating state. Pork Producers, 598 U.S. at 376 n.1. The Court then reserved the question as to whether a state law of that kind was per se invalid under the Dormant Commerce Clause, see id., as the Court's majority opinion in Edgar ultimately invalidated the state law only under the balancing test set forth in Pike v. Bruce Church, Inc., 397 U.S. at 142, and not on the ground that it was per se invalid because of its extraterritorial reach, see Edgar, 457 U.S. at 643 (majority opinion).

It is not entirely clear what Pork Producers means by its reference to "those with no connection to" the regulating state (there, Illinois) in describing the out-of-state transactions that the law in Edgar directly regulated. Pork Producers, 598 U.S. at 376 n.1. All of the out-of-state transactions regulated by that law concerned shares in a company that itself had some ties to Illinois.[10] But, regardless, we do not understand Pork Producers

_____

[10] The Act regulated tender offers made for shares of a "target company," which was defined as any corporation (1) with ten percent of the securities subject to the offer owned by

- 18 -

to resolve how we must address a Dormant Commerce Clause challenge to the enforcement of a law that, like the enforcement of the Dealer Law at issue here, directly regulates out-of-state transactions. Cf. Styczinski v. Arnold, 727 F. Supp. 3d 821, 825 (D. Minn. 2024) (distinguishing Pork Producers on this ground), cert. denied, 146 S.Ct. 1452 (2026) (mem.). And that is significant because, as the District Court and the parties recognize, we did address such a challenge in IMS Health. See 616 F.3d at 23-32. We thus see no reason not to apply our analysis there to this case.[11]

---

shareholders in Illinois or (2) which satisfied two of three conditions: had its principal executive office in Illinois, was incorporated in Illinois, or had ten percent or more of its stated capital and paid-in surplus represented in the state. Edgar, 457 U.S. at 627 (majority opinion).

[11] In Pork Producers, the majority observed in a footnote that some commentators had suggested that the law at issue in Edgar did not test the limits of the Dormant Commerce Clause so much as "the territorial limits of state authority under the Constitution's horizontal separation of powers." Pork Producers, 598 U.S. at 376 n.1. But cf. Edgar, 457 U.S. at 643 (plurality opinion) (observing that, for Dormant Commerce Clause purposes, "any attempt directly to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power" (citation modified)); H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 535 (1949) (stating that the Court, through its Dormant Commerce Clause jurisprudence, "has advanced the solidarity and prosperity of this Nation"). But the majority in Pork Producers explained that, either way, the law before it there was distinguishable because it did not "directly regulate[] out-of-state transactions by those with no connection to the State." Pork Producers, 598 U.S. at 376 n.1. Here, of course, the law does directly regulate an out-of-state transaction but, because the parties address only the Dormant Commerce Clause,

c.

In IMS Health, we considered a Dormant Commerce Clause challenge to a Maine statute that prohibited the sale of certain data -- namely, data regarding the prescribing practices of Maine health care providers who opted into the law's protections -- irrespective of whether such sales took place within Maine.[12] Id. at 12-13. Despite expressly acknowledging that the Maine law in that case regulated "out-of-state transactions," id. at 14, we held that the law "d[id] not raise constitutional concerns under the [D]ormant Commerce Clause," id. at 25. We explained:

> The Supreme Court's current [D]ormant Commerce Clause jurisprudence is concerned with preventing economic protectionism and inconsistent regulation, not with enforcing geographical limits on states' exercise of their police power that necessarily regulate commerce. Even under the extraterritoriality branch of the [D]ormant Commerce Clause, the Supreme Court has not barred states from regulating any commercial transactions beyond

we have no occasion to consider whether it raises independent concerns regarding the horizontal separation of powers.

[12] Specifically, the statute provided that prescribers of pharmaceutical drugs in Maine may opt out of the sale of identifying data regarding their prescribing practices if the sale of their data would be for "any marketing purpose." IMS Health, 616 F.3d at 12-13 (quoting Me. Rev. Stat. Ann. tit. 22, § 1711-E(2-A)). The law provided the Maine Attorney General with authority to enjoin violations of the law and to impose civil penalties of up to $10,000 per violation. Id. at 18.

their borders that involve their own citizens and create in-state harms.

Id. As to that "extraterritoriality branch," we explained, state laws "that 'force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another'" "are not invariably struck down." Id. at 30 (quoting Healy, 491 U.S. at 337). We identified as support for that conclusion a law "with a strong in-state nexus" that the Court, after Edgar, had upheld against a Dormant Commerce Clause challenge. See id. (citing CTS Corp., 481 U.S. at 88-89); see also id. at 30 n.29 (stating that "States' interests may justify extraterritorial regulation").

We also identified various features of the Maine law that spared it from invalidation under the Dormant Commerce Clause, even though it directly regulated out-of-state transactions. Those features were the following.

First, we explained (repeatedly) that there was no basis for concluding that the Maine law raised concerns about economic protectionism. See id. at 25, 27-28, 30 & n.30. Indeed, we pointed out that the Maine law prevented the sale of Maine prescriber data by any business if that data would be used "for a marketing purpose." Id. at 12. It therefore did not protect any business (let alone any business in Maine) against competition from any other business. See id. at 27-28.

We further explained that Maine's law "dealt with harms caused exclusively inside the regulating state." Id. at 30. That was so, we reasoned, because the law was "concerned only with prescribers in the health care system of Maine," id. at 25 (citation modified), and sought to remedy "specific harms . . . occurring in Maine," including "invasions of prescribers' privacy, increased health care costs, and harms to public health," id.

In addition, we explained that the Maine law was "limited to regulating transactions with a significant inherent connection to the regulating state, and involving its own professional licensees." Id. at 30. As we noted, the law "targets a series of underlying transactions that . . . start and end in Maine," as "Maine prescribers' prescriptions are primarily, if not exclusively, filled at Maine pharmacies," with the data from those prescriptions ultimately intended to be used in marketing practices "that target[] Maine prescribers in Maine." Id. at 25-26. Moreover, we explained, because the law was "limited to transactions involving" "Maine prescribers [who] affirmatively indicate that they want Maine to protect the confidentiality of their identifying information," "[e]very intermediate step" of the transaction involved Maine prescribers' identifying data. Id. at 26.

In identifying those features of the Maine law, we emphasized that, together, they distinguished Maine's statute from laws like the one struck down in Edgar. See id. at 30-31; see also id. at 31 ("Those differences, and not the mere fact that those statutes directly regulated out-of-state transactions, explain why the Supreme Court deemed th[e] statutes [in Healy, Brown-Forman, and Edgar] wholly extraterritorial."); id. at 31 n.31 (describing Edgar as "reach[ing] conduct in which Illinois had no conceivable interest"). And, we explained, those last two features of the Maine law, together, made it more like the Indiana takeover statute that the Supreme Court upheld against a Dormant Commerce Clause challenge in CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69. IMS Health, 616 F.3d at 31. Unlike the takeover law at issue in Edgar, we emphasized, the one at issue in CTS Corp. was upheld because of its "clear in-state nexus and impact." Id.

Finally, we explained that the Maine statute was like the measure in CTS Corp. in still one additional respect: It was not "likely to subject entities engaged in interstate commerce to incompatible cross-state regulatory regimes." Id. at 28; see also CTS Corp., 481 U.S. at 88 (distinguishing the statute there from laws that, like the one in Edgar, risked "subjecting activities to inconsistent regulations"). We explained that the reason that the Maine statute did "not risk imposing regulatory obligations

- 23 -

inconsistent with those of other states" was that "[n]o other states have erected competing regulations, much less opposing regulations requiring the transfer of Maine prescribers' data." IMS Health, 616 F.3d at 28.

RITC argues that IMS Health affirmatively "compel[s] reversal here" because it cannot be distinguished from this case. RITC asserts that "the Dealer Law does not purposefully discriminate against out-of-state interests" because "it applies evenhandedly to both in-state and out-of-state manufacturers" and therefore "does not advantage in-state businesses or disadvantage out-of-state rivals." RITC further contends that the Dealer Law is like the Maine statute in IMS Health because the Dealer Law, too, "was designed to protect against harms occurring in-state and written to ensure that it only appl[y] to matters with a strong [in-state] connection." Finally, RITC contends that the Dealer Law is like the Maine law in that it "does not risk imposing regulatory obligations inconsistent with those of other states," IMS Health, 616 F.3d at 28, because Daimler could have "provided [RITC with] notice and the opportunity to protest . . . without violating Massachusetts law because Massachusetts law does not prohibit notice."

We cannot agree. Instead, we agree with Daimler that the Dealer Law, if it were enforced to order Daimler to terminate its franchise agreement with ATG Raynham in Massachusetts, would

- 24 -

exhibit each of the characteristics that we explained the Maine law in <u>IMS Health</u> did not.

First, although the Dealer Law treats in-state and out-of-state manufacturers the same, <u>see</u> R.I. Gen. Laws § 31-5.1-1(8), it differs from the Maine law in that it operates to restrict competition, as demonstrated by RITC's efforts here to prevent its direct competitor from doing business in the same county as RITC. <u>See</u> <u>RITC II</u>, 338 A.3d at 1061 (stating that the Dealer Law's "broad sweep establishes the legislature's intent to provide dealers with a minimum area of protection against manufacturer competition"). Moreover, as Daimler also points out, in advancing that interest, the Dealer Law treats out-of-state dealers disparately from in-state dealers because it "gives Rhode Island dealers the ability to block the appointment of a competing dealer in another state while denying that same out-of-state dealer an equivalent right in Rhode Island." <u>Contrast</u> <u>Fireside Nissan</u>, 30 F.3d at 209 (affirming constitutionality of excluding an out-of-state dealership from protest proceedings regarding an in-state dealership), <u>with</u> <u>RITC II</u>, 338 A.3d at 1064 (holding that the "relevant market area" protected under § 31-5.1-4.2(a) can extend beyond the state's borders). Thus, the Dealer Law raises the specter of economic protectionism in a way that the Maine law did not. <u>Cf.</u> <u>United Haulers Ass'n</u> v. <u>Oneida-Herkimer Solid Waste Mgmt. Auth.</u>, 550 U.S. 330, 338 (2007) ("In [the Dormant Commerce

Clause] context, discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." (citation modified)); Fireside Nissan, 30 F.3d at 214 (concluding that Rhode Island's Dealer Law, which was there presumed not to apply outside the state, did not have a discriminatory purpose in part because it was "not designed to promote local dealers at the expense of out-of-state dealers").

The Dealer Law also differs from the Maine law because it does not regulate exclusively in-state harms, at least if enforced against Daimler to block it from establishing a dealership in Massachusetts. In IMS Health, we explained that the Maine law prevented advertising "that targets Maine prescribers in Maine," 616 F.3d at 26, in order to prevent "invasions of [those] prescribers' privacy, increased health care costs, and harms to public health . . . in Maine," id. at 25. Here, in contrast, RITC's requested enforcement of the Dealer Law to bar Daimler's out-of-state dealership would directly prevent vehicle sales across the border, in Massachusetts. By defining a dealer's "relevant market area" to extend beyond the state's borders, in other words, the Dealer Law purports to protect against harmful invasions of that area of protection even where those invasions would occur outside the state. See RITC II, 338 A.3d at 1062

(describing the "relevant market area" defined in the dealer law as providing a "protective circle").

Of course, we recognize that, as a Rhode Island dealer, RITC would experience whatever harms flow from such out-of-state sales within Rhode Island. But we explained in Fireside Nissan that the Dealer Law was "designed to protect existing dealers and consumers from the detrimental effects of aggressive franchising practices by . . . automobile manufacturers" that "are considered to be potentially 'injurious to the public welfare' if not properly regulated." 30 F.3d at 211 (emphasis added) (quoting R.I. Gen. Laws § 31-5.1-4.2(b)(4)). Similarly, the Dealer Law's implementing regulations state that their purpose is "to protect the interest of the public when dealing with motor vehicle dealers in Rhode Island." 280 R.I.C.R. 30-20-1.2(A) (LexisNexis 2026) (emphasis added). Thus, while the Dealer Law protects in-state dealers like RITC from the in-state harms resulting from certain business practices by their franchisors, that protection is provided at least in part to prevent harms to consumers in the market for new motor vehicle dealers. For that reason, unlike in IMS Health, the harms sought to be prevented are not harms occurring only within Rhode Island's borders. Indeed, the state's own definition of "relevant market area" appears to recognize that the harms that arise in that market do not stop at state lines. See RITC II, 338 A.3d at 1061; see also New Motor Vehicle Bd. of

Cal. v. Orrin W. Fox Co., 439 U.S. 96, 102 (1978) (explaining that state dealer laws "protect[] the equities of existing dealers by prohibiting automobile manufacturers from adding dealerships to the market areas of its existing franchisees where the effect of . . . intrabrand competition would be injurious to existing franchisees and to the public interest" (emphasis added)).

Moreover, the Dealer Law, as enforced against Daimler here, would not directly regulate only those out-of-state transactions that have "a significant inherent connection" to Rhode Island. IMS Health, 616 F.3d at 30. As we explained above, in IMS Health, Maine's statute targeted only transactions that "start and end in Maine." Id. at 25. And we further observed that "[e]very intermediate step" regulated by Maine's law was "limited to transactions involving" the data of its in-state prescribers. Id. at 26. Here, in contrast, RITC asked the Board to order Daimler to terminate its franchise with a Massachusetts dealer that no party has asserted is licensed in Rhode Island and which sells vehicles outside Rhode Island, including to non-Rhode Island consumers. Those transactions do not in any sense "start and end" in Rhode Island. Nor is it the case that every such transaction has an intimate connection with in-state entities in the way that the sales of Maine's prescriber data did in IMS Health. Cf. id. at 29 (stating that the Maine statute regulates sales of prescriber data that "affect[] only Maine prescribers").

- 28 -

Finally, unlike in IMS Health, there is a "risk" here of "imposing regulatory obligations inconsistent with those of other states." Id. at 28. In that regard, RITC concedes that "it may be true that [Daimler] would be subject to a potential claim from the Massachusetts dealer if it terminated its dealership" in that state. (Referencing Mass. Gen. Laws ch. 93B, § 5.) We thus must proceed on the understanding that Daimler could be found in violation of Massachusetts law if it terminated its franchise agreement with ATG Raynham. Under these circumstances, then, it is plain that an order from the Board forcing Daimler to do just that would "subject[ Daimler's] activities to inconsistent regulations." CTS Corp., 481 U.S. at 88; see also Healy, 491 U.S. at 336-37 ("[T]he practical effect of the statute must be evaluated . . . by considering how the challenged statute may interact with the legitimate regulatory regimes of other States . . . .").

RITC responds that "it is not conflicting regulatory regimes that create the alleged catch-22" that Daimler faces. It contends that this consequence results from Daimler's "own actions" in granting a franchise to ATG Raynham within RITC's AOR without first providing RITC an opportunity to protest. But we rejected a similar argument in Hyde Park Partners, L.P. v. Connolly, which concerned a Dormant Commerce Clause challenge to

a Massachusetts corporate takeover law.  See 839 F.2d 837, 840 (1st Cir. 1988).

The law at issue in Hyde Park Partners (1) required prospective takeover bid offerors to make certain disclosures and (2) if they failed to do so, barred them from "mak[ing] a takeover bid for th[e] target [company] until one year after the failure to disclose."  Id.  There, the parties defending the law argued that the second requirement was not unduly burdensome because "one who fails to comply with" the first, "minimally burdensome disclosure requirement has little basis on which to complain of the penalty for noncompliance."  Id. at 847.  In rejecting that argument, we explained that a state is not at liberty to fashion a deterrent that places undue burdens on interstate commerce merely because a regulated party may avoid those burdens by complying with an antecedent provision.  See id. at 847-48.

Thus, unlike the statute we upheld against Dormant Commerce Clause challenge in IMS Health, the statute here does "raise[] independent concerns about protectionism," 616 F.3d at 30, and does "risk imposing regulatory obligations inconsistent with those of other states," id. at 28.  In addition, unlike the statute in IMS Health, the Dealer Law neither "deal[s] with harms caused exclusively inside the regulating state," nor is "limited to regulating transactions with a significant inherent connection

- 30 -

to the regulating state, and involving its own professional licensees." Id. at 30.

For these reasons, by directly regulating Daimler's out-of-state transactions absent a sufficiently "strong in-state nexus" like that which we found sufficient in IMS Health, id., we conclude that enforcing the Dealer Law under the facts of this case would violate the Dormant Commerce Clause. That is not to say that a state law will survive constitutional scrutiny only when an out-of-state transaction's connections to the regulating state are identical to those in IMS Health. But the connections here are not sufficient under that precedent, given how they differ from the connections in that case and the risks of both economic protectionism and inconsistent regulation that enforcement of the Dealer Law in this case would pose. Accordingly, we reject RITC's challenge to the District Court's ruling granting summary judgment to Daimler.[13]

---

[13] We note that, in the typical Dormant Commerce Clause case, the state is often the party that endeavors to justify the constitutionality of the challenged law. See, e.g., Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 353 (1977). Here, however, the Rhode Island Office of Attorney General opted not to intervene in this appeal after our Court certified to that office the fact that the constitutionality of the Board's enforcement of Rhode Island's Dealer Law had been drawn into question under the facts of this case. See 28 U.S.C. § 2403(b) ("In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such

## III.

We therefore **affirm** the District Court's order granting summary judgment to Daimler.

---

fact to the attorney general of the State, and shall permit the State to intervene . . . ."). Thus, RITC's burden was only to show that the District Court erred in concluding that the Board could not constitutionally apply the Dealer Law to Daimler's conduct under the facts here, and we therefore do not address whether Rhode Island in another case could meet the burden that RITC failed to meet in this one.